TRULINCS 54001048 - BRENNERMAN, RAHEEM J - Unit: BRO-I-B

--------------------------------------------------------------------------------

FROM: 54001048
TO:
SUBJECT: Re: RULE 29 & 33 MOTION REPLY - COVER
DATE: 05/22/2018 08:50:20 AM

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
====================================

UNITED STATES OF AMERICA

    v.                               Case No. 17 CR. 337 (RJS)

RAHEEM J. BRENNERMAN
       Defendant

====================================

DEFENDANT`S MEMORANDUM OF LAW REPLY TO GOVERNMENT`S
OPPOSITION TO THE DEFENDANT`S POST-TRIAL MOTIONS

                                                Raheem J. Brennerman
                                                Defendant Pro Se

                                                Metropolitan Detention Center
                                                P O Box 329002
                                                Brooklyn, New York 11232

TRULINCS 54001048 - BRENNERMAN, RAHEEM J - Unit: BRO-I-B

---

FROM: 54001048
TO:
SUBJECT: Re: RULE 29 & 33 MOTION REPLY - TOA/R
DATE: 05/22/2018 06:34:12 AM

TABLE OF AUTHORITIES

United States v. Laljie (2d Cir. 1999)

United States v. Blackmon (2d Cir. 1988)

United States v. Rodriguez (2d Cir. 1998)

United States v. King (6th Cir. 1999)

United States v. Garrido (6th Cir. 2006)

United States v. Clay (6th Cir. 2003)

United States v. Martin (6th Cir. 1967)

Newman v. Metrish (6th Cir. 2006)

United States v. Valle (2d Cir. 2015)

United States v. Clark (2d Cir. 2014)

United States v. Lorenzo (2d Cir. 2008)

United States v. Aguiar (2d Cir. 2013)

United States v. Sanchez (2d Cir. 1992)

United States v. Colon-Munoz (1st Cir. 2003)

United States v. Bass (Supreme Court)

United States v. Best (1990, MD Tenn)

United States v. Cocilova (2008, WD Va)

United States v. Odiodio (2001, CA5 Tex)

United States v. White (2009, MD Ala)

United States v. Ashurov (2013, CA3 Pa)

United States v. Kliti (2d Cir. 1998)

United States v. Rommy (2d Cir. 2007)

United States v. Svoboda (2d Cir. 2003)

United States v. Lange (2d Cir. 2016)

United States v. Tzolov (2d Cir. 2011)

United States v. Rodriguez-Moreno (1999)

TRULINCS 54001048 - BRENNERMAN, RAHEEM J - Unit: BRO-I-B

---

United States v. Mulder (8th Cir. 1998)

United States v. Certified Envtl. Servs (2d Cir. 2014)

United States v. Weaver (2d Cir. 2017)

United States v. Corsey (2d Cir. 2013)

United States v. Harvey (2d Cir. 1976)

United States v. Foster (D.C Cir. 1993)

Napue v. Illinois (1959)

Bardy v. Maryland

Mooney v. Holohan (1935)

Pyle v. Kansas (1942)

United States v. Williams (2d Cir. 2012)

United States v. Banki (2d Cir. 2012)

Cuyler v. Sullivan (1980)

Wheat v. United States (1998)

United States v. Dolan (3rd Cir. 1978)

Hughes v. Rowe (1980)

Estelle v. Gamble (1976)

RULES AND STATUTES

18 U.S.C. S 1344

18 U.S.C.S 1349

18 U.S.C.S 1343

18 U.S.C.S 1546

Fed. R. Crim. P. 29

Fed. R. Crim. P. 33

Fed. R. Crim. P. 18

TRULINCS 54001048 - BRENNERMAN, RAHEEM J - Unit: BRO-I-B

---

FROM: 54001048
TO:
SUBJECT: Re: RULE 29 & 33 MOTION REPLY - PART I
DATE: 05/22/2018 06:10:04 AM

PRELIMINARY STATEMENT

Defendant Pro Se, Raheem Brennerman ("Brennerman") submits this memorandum of law and all prior papers and proceedings, and will move this Court before the Honorable Judge Richard J. Sullivan, United States District Judge, as soon as defendant pro se, motion may be considered, for an order granting a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, or in the alternative for an order granting a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure based on the sufficiency of the evidence adduced at trial, conflict of interest with trial counsel, lack of essential elements required for convicting defendant of the charged crime, among others; and granting such other relief as the Court may deem just and proper. This reply memorandum represents the defendant`s response to government`s opposition memorandum dated 14 May 2018 at (Dkt. no. 149) to his Rule 29 and 33 motions at (Dkt. 128 ("Defendant Memorandum") and 129 ("Defendant Supplement Memorandum")).

BACKGROUND
I. The Indictment

On March 3, 2017, government commenced action against defendant and Blacksands Group in a criminal contempt of court case and on March 7, 2017, the court signed an order to show cause directed ONLY at Blacksands Group and issued an arrest warrant for defendant for probable cause to believe he had violated 18 USC Section 401(3), criminal contempt of court for orders that were directed at the company (Blacksands Group) and not him personally, based on the argument that Blacksands Group was the alter-ego of defendant. See (docket no. 140 in case no. 15-cv-70) and (docket no. 114 in case no. 17 CR. 155 (LAK)). Indeed in order to legally pierce through the corporate veil of a Delaware "C" Corporation both the government and the Court had to argue that Blacksands Group was the alter-ego of the defendant in order to hold the defendant personally liable for "abetting and directing" the company (Blacksands Group) and willfully disobeying court orders that were not directed at him personally but to the company (Blacksands Group). However on May 31, 2017, government obtained an indictment for among others - Conspiracy to commit bank and wire fraud after making the exact opposite and contrasting argument and presentment to a grand jury - arguing that Blacksands Group was an "artifice to defraud" and that there were other alter-egos of Blacksands Group. Indeed both theories cannot be possible that on the one hand Blacksands Group was the alter-ego of defendant so as to hold him personally liable for orders that were directed at Blacksands Group and not him personally while on the other hand also arguing that Blacksands Group was an artifice to defraud and that a conspiracy involving others existed. Government in their opposition motion highlight that [Aderinwale] is an officer of the company. Most important is that government did not provide the grand jury with all MATERIAL information at the time of their presentment because they likely did not inform the grand jury of the events that occurred weeks earlier that government arrested the defendant and are prosecuting the defendant for criminal contempt of court, based on orders directed at the company and not him personally because their position was that the company was his alter-ego which contradicts the arguments presented to the grand jury for obtaining the indictment, that a conspiracy existed with other alter-egos of the company. Thus, government commenced this action by making contradicting arguments and material omissions to the grand jury.

II. The trial

The trial against defendant began on November 26, 2017. At trial, the government presented testimony from 24 witnesses, including three current or former employees of banks from which the defendant sought loans or investment banking services (Julian Madgett, Kevin Bonebrake and Scott Stout), three oil and gas industry executives who had dealt with the defendant (James Hagemeier, Kelly Plato and Scott Wood), six law enforcement agents and employees (Special Agent Christopher Nieves, Administrative Support Specialist Enrique Santos, Special Agent Jannell Borrison, Criminal Investigator Justin Ellard, Criminal Investigator Mason Posilkin and Special Agent William Culley), an expert from the oil and gas industry (Gardner Walkup), a forensic accounting expert (Howard Berkowitz), an employee of United States Citizenship and Immigration Services (Richard Collins), an employee of the United States Department of State (Matthew Paschke), an employee of the Federal Deposit Insurance Corporation (Barry Gonzalez), and a woman whom the government claims the defendant had impersonated in emails and letters, including by claiming falsely that she was an employee of Blacksands (Lisa Charles). The government introduced nearly 300 exhibits, including emails which the government claims the defendant exchanged with victims of his scheme, text messages, with an alleged co-conspirator, promotional materials which government argues as his purported company, portions of defendant videotaped post-arrest statement, financial records, excerpts of telephone calls made by defendant from MCC (pre-trial detention) and receipts and photographs showing the defendant`s disposition of his funds which government alleged are fraud`s proceeds. On December 6, 2017, after a few hours of deliberation, the jury returned a verdict of

guilty on all counts.

However devoid of the evidence at trial, was any, evidence or witness from Morgan Stanley Private Bank or Morgan Stanley Bank NA, the two FDIC Morgan Stanley subsidiaries as distinguished to Morgan Stanley Smith Barney where Scott Stout previously worked at and Morgan Stanley Investment Bank where Kevin Bonebrake previously worked at. Nor was there any evidence that defendant ever interacted with either Morgan Stanley Private Bank or Morgan Stanley Bank NA. Also devoid from trial records is the ICBC London lending file, thus the Court and Jury were left with the assertions of government prosecutors and the statement of government witness - Julian Madgett without any demonstrable evidence to confirm the essential element of Materiality. Because defendant trial counsel failed to insist on obtaining the ICBC London lending file prior to trial after being denied the file by U.S District Court ruling at docket no. 76 in case no. 17 CR. 155 (LAK). At trial government adduced no evidence that in 2012, defendant misrepresented his name or national origin or the scale and scope of the company - Blacksands. Finally government adduced no evidence to support the argument that there were false claim or statement "which he knew to be falsely made", or that defendant was aware that any such inaccurate boxes may have been checked by the agency which he engaged for his visa application.

Even at this late junction in this case, there are pending questions which remain unanswered such as (1.) Did Scott Stout work for Morgan Stanley Smith Barney which is not FDIC insured or Morgan Stanley Private Bank which is FDIC - Defendant argues he worked for Morgan Stanley Smith Barney which is not a bank and not FDIC insured. (2.) Did the defendant interact or engage with anyone at Morgan Stanley Private Bank or Morgan Stanley Bank NA, the FDIC insured subsidiaries of Morgan Stanley and defendant argues - No. (3.) Is Morgan Stanley Smith Barney where Scott Stout worked at, FDIC insured and is Morgan Stanley Investment Bank where Kevin Bonebrake worked at, FDIC insured. Defendant will argue - No. (4.) Was there any intent-to-victimize either Morgan Stanley Private Bank or Morgan Stanley Bank NA - Defendant will argue that not only did he have no interaction with those institutions there was never any connection to either institution - NO.  Hence the government has failed to satisfy the essential element required for a bank fraud conviction. Thus the issue presented at this late stage is that government prosecutors clearly were unable to distinguish the different Morgan Stanley subsidiaries, much less the jurors who do not possess any banking or legal background. Also devoid from evidence at trial or government's opposition motion are the exhibits presented by defendant in his Rule 29 and 33 motion at (dkt. no. 128). Government exhibits 1-19, 1-22 all of which rebuts and contradicts government's own narrative and the testimony of Julian Madgett at trial. Neither did government address the Napue violation caused by government allowing false narrative of Julian Madgett to go uncorrected at trial, because it possessed the said exhibits which contradicted his testimony. Ultimately government presented no evidence regarding $300 million fraud or misappropriation of $300 million.

III. Summary of Proof at Trial

Government commenced its arguement by stating "the defendant made similar representation to Morgan Stanley which is insured by the FDIC in an attempt to induce its employees to provide him with private banking services and make loans to the defendant's company for the purported acquisition of the California oilfield." Perhaps government is confused as to this element of FDIC because at trial, government presented Scott Stout that worked at Morgan Stanley Smith Barney and Kevin Bonebrake that worked at Morgan Stanley Investment Bank. Neither Morgan Stanley Smith Barney or Morgan Stanley Investment Bank are FDIC insured, thus, even at this late stage, defendant is confused as to which FDIC insured bank the government is referring to because defendant never interacted or speak with anyone at Morgan Stanley Private Bank or Morgan Stanley Bank NA. And Morgan Stanley & Company, LLC the ultimate parent company to all Morgan Stanley subsidiaries and businesses is not FDIC insured.

In summary the government argues that defendant lied to Morgan Stanley Smith Barney to obtain perks including... American Express "Platinum" card "[a]s a Morgan Stanley perk. And among other things, Morgan Stanley paying the annual fee associated with the card if expenditure using the card exceeded $100,000 annually, "[n]o foreign transaction fees, " and a "20% Travel Bonus." And Mr. Scott Stout introduced the defendant to Mr. Kevin Bonebrake at Morgan Stanley Investment Bank as part of the perks. First, government failed to realize or even establish that the services were provided by Morgan Stanley Private Bank or Morgan Stanley Bank NA. Moreover both the account opening application form and bank statement, Exhibit (GX 1-57, GX 1-57A, GX 529, 530, 531, 532), which the government referred to clearly indicated that the account was opened with Morgan Stanley Smith Barney which is not FDIC insured in fact the bank statement clearly indicates that Morgan Stanley Smith Barney is a member SIPC to emphasize that it is not a bank and not federally insured. The same is correct for Morgan Stanley Investment Bank where Kevin Bonebrake worked at, because Morgan Stanley Investment Bank is not FDIC insured. Hence government makes all these arguments, although erroneously without highlighting any federal interest, because none of the Morgan Stanley subsidiaries which government highlight are federally insured, an essential element of the bank fraud statute. Surprisingly, there were several investigators and law enforcement officers working with government prosecutors, there was evidence in government possession which informed government of Morgan Stanley Smith Barney such as the account application form and bank statement however no-one asked or questioned Mr. Scott Stout whether he worked at Morgan

TRULINCS 54001048 - BRENNERMAN, RAHEEM J - Unit: BRO-I-B

-----------------------------------------------------------------------------------------

Stanley Smith Barney of Morgan Stanley Private Bank.

A defendant must intend to cause a bank a loss or potential liability, whether by way of "statutory law, common law or business practice". "United States v. Laljie, 184 F.3d 180, 191 (2d Cir. 1999); In Blackmon, the court noted that the requisite intent to "victimize a bank" which is apparent from reading the Senate reports on the statute, and which the court have implied into subsection (1), was intended to apply to all crimes charged under the statute. id. at 905-06. Thus, to take money in the custody of a bank is not a crime under the statute unless there is a concomitant to victimize the bank. "United States v. Blackmon, 839 F.2d 900 (2d Cir. 1988); A deceptive pattern of conduct designed to deceive a bank was required to prove a case under either subsection (1) or (2). "United States v. Rodriguez, 140 F. 3d 163, 167 n.2 (2d Cir. 1998). Here government adduced no evidence that defendant interacted or dealt with a bank because neither Morgan Stanley Smith Barney or Morgan Stanley Investment Bank are federally insured bank and there are no evidence adduced by government that defendant intended to cause a bank a loss or potential liability.

TRULINCS 54001048 - BRENNERMAN, RAHEEM J - Unit: BRO-I-B

---

FROM: 54001048
TO:
SUBJECT: Re: RULE 29 & 33 MOTION REPLY - PART II
DATE: 05/22/2018 06:10:54 AM

Government presents several narratives regarding ICBC London and the transaction between Blacksands and ICBC (London), however government failed to procure or review the ICBC (London) lending file pertaining to the transaction so as to ascertain the issue of materiality an essential element of the charged crime of wire fraud. Thus the Court and Jury were left to accept narrative proffered by government and its witness - Julian Madgett at trial. Even without the ICBC London lending file, government were in possession of other evidence, government exhibits 1-19 and 1-22 which contradicts government narrative and arguments and the testimony of Julian Madgett.

For instance, Exhibit 1-19, where defendant advised Mr. Bo Jiang of ICBC London that $5 million from the $20 million bridge finance will be utilized to replace expenses already incurred, specifically the $6.45 million paid as interest fee as stated above. Another email was exchanged between defendant and Mr. Julian Madgett of ICBC London on October 30, 2013, re-affirming the same message sent earlier to Mr. Bo Jiang. At trial, government was obligated to correct the inaccurate testimony of Mr. Julian Madgett regarding the agreed use of the $5 million (net $4.4 million bridge loan funds). On November 8, 2013, Exhibit 1-22, on page 3, defendant wrote "that group financial statement was not part of the initial discussions or the basis for which the deal (finance) and finance interest was agreed. The provision of parent audited financial will have to be reflected in the finance interest coupon which was then agreed at L(libor) +6.95%, since this was negotiated as an insulated finance (Asset Finance) without much focus on other group activities however now amended through this additional CP, hence must be reflected with a lower finance interest coupon". On page 4, of the same exhibit, the defendant stated "as discussed and agreed the bridge finance facility will be provided with $15 million on escrow and the $5 million released. Note that the request for the $5 million release is due to the fact that BSPAB - Blacksands Pacific Alpha Blue LLC has utilized part of the funds set-aside for the project (Pre- Acquisition) to pay for the HY (high yield) note interest (for the $200 million set-aside). Hence the released bridge finance funds will replace this amount until acquisition closing. That reflected the basis in which the bridge finance was agreed. On November 14, 2013. Mr. Julian Madgett sent e-mail attaching written confirmation that the $20 million bridge finance has been approved, with the bank increasing the finance interest from L+6.95% to L+9.95% to reflect the insulated finance and not taking any other group activities or financials into consideration. Exhibits, 1-19 and 1-22 were all appended to defendant rule 29 and 33 motion at (dkt. no. 128).

Government attempts to obfuscate the issue and the discussions between ICBC (London) and Blacksands by adducing at trial emails from months prior to the discussion or negotiation of the bridge finance while failing to highlight evidence mentioned above, which represents discussion between Blacksands and ICBC (London), a week prior to the approval of the bridge finance thus representing the final discussions prior to the approval of the bridge loan finance. Furthermore government argues that defendant claimed that Blacksands had imminent transaction to acquire the Cat Canyon oilfield, perhaps government failed to conduct appropriate diligence, because the civil case (Case no. 15-cv-70) contains exhibits, correspondences and documents between ERG and Blacksands, with respect to Blacksands acquiring the oilfield. Even while in bankruptcy, ERG continued to pursue Blacksands to acquire the oilfield, even as of July 2016, Blacksands was still in discussion with Sean Clement of Opportune LLP, the receiver of ERG and the oilfield with respect to Blacksands acquiring the oilfield, thus government completely fails to appreciate the facts in this matter.

Government indicted defendant for misrepresenting his "name", "national origin" and the scale and scope of Blacksands. Nothing adduced at trial or argued by government in their opposition memorandum demonstrates that defendant misrepresented his name, national origin or the scope and scale of Blacksands.

IV. The Defendant`s Rule 29 and 33 Motions.
On March 27, 2018, defendant moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and in the alternative for a new trial pursuant to Rule 33. On April 5, 2018, defendant filed a supplemental memorandum in support of his motion.

APPLICABLE LAW

A Rule 29 motion for judgment of acquittal is "A Challenge to the sufficiency of the evidence. "See U.S. V. King, 169 F. 3d 1035, 1038 (6th Cir. 1999) (Internal Quotations Omitted). As one leading treatise states, a "Judgment for Acquittal...is an important safeguard to the defendant. It tests the sufficiency of the evidence against defendant, and avoid the risk that a jury may capriciously find him guilty though there is no legally sufficient evidence of guilt." 2A Charles A. Wright, Fed Prac & Proc. Crim. 461 (4th ed. 2013).

TRULINCS 54001048 - BRENNERMAN, RAHEEM J - Unit: BRO-I-B

--------------------------------------------------------------------------------

The relevant question in assessing a Rule 29 is "whether after viewing the evidence in the light most favorable to the prosecution, any rational tier of fact could have found the essential elements of the crime beyond a reasonable doubt." See United States v. Garrido, 467 F. 3d 971, 984 (6th Cir. 2006) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979) (Emphasis in the original)). A Court may properly conclude a conviction is supported by sufficient evidence even though the government has presented only circumstantial evidence and even though such evidence does not exclude every reasonable hypothesis except that of guilt. "United States v. Clay, 346 F. 3d 173, 176 (6th Cir. 2003). The Court in making its determination as to whether the government has met its burden should be highly critical of the manner in which the evidence was presented to the jury. Here, the defendant was unable to engage in any meaningful cross-examination of government sole witness from ICBC London because his request to obtain the ICBC London lending file at issue was denied and the erroneous and false testimony of ICBC London sole witness was left unchallenged and uncorrected, which caused prejudicial spillover. Moreover, defendant suffered for ineffective assistance of counsel because his trial counsel had conflict of interest issue and were protecting their interest while also attempting to offer counsel to the defendant. All of which had a residual effect on the jury. A great majority of the evidence focused on materials which were purported to be part of the ICBC London transaction at issue however went unchallenged because defendant was deprived of the ability to offer the ICBC London lending file for his good faith defense.

Importantly, however, "[t]he prosecution...must present substantial evidence as to each element of the offense from which a jury could find the accused guilty beyond a reasonable doubt. "Brown v. Davis, 752 F. 2d 1142, 1145 (6th Cir. 1985) (Internal Citation Omitted) (emphasis added). "Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred. "United States v. Martin, 375 F.2d 956, 957 (6th Cir. 1967). And furthermore, although circumstantial evidence also can support a conviction, there are times that it amounts to only a reasonable speculation and not to sufficient evidence. "Newman v. Metrish, 543 F.3d 793, 796 (6th Cir. 2008). Understanding that government presented falsely that Scott Stout worked for Morgan Stanley Private Bank instead of Morgan Stanley Smith Barney inaccurately informed the jurors that government had satisfied the essential element to convict for bank fraud - the FDIC insurance. Moreover government adduced a single page record from U.S State Department which was insufficient to demonstrate beyond a reasonable doubt that defendant misrepresented his name, national origin (nationality) and the scale and scope of Blacksands Group.

In reviewing the verdict with such a high level of deference to the jury's determinations, the Court should be mindful of its responsibility to protect the defendant's Fifth Amendment rights. See, e.g., United States v. Valle, 807 F.3d 508, 513 (2d Cir. 2015). If courts "are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, we must take seriously our obligation to assess the record to determine...whether a jury could reasonably find guilt beyond a reasonable doubt. " id. at 515 (alteration in original) (quoting United States v. Clark, 740 F.3d 808, 811 (2d Cir. 2014)). In particular, "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty. If the evidence viewed in the light most favorable to the prosecution gives equal or nearly circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." Id. (quoting United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008). In the matter before this Court, the Government presented Mr. Brennerman as a fraudulent businessman who make misstatements, then presented a theory with respect to the wire fraud without any material evidence - the ICBC London lending file, except for the testimony of Julian Madgett. Moreover the government also made inappropriate reference to defendant's ties to Nigeria to promote Nigerian Xenophobic prejudice.

Although the Court must assess a Rule 29 motion "with all reasonable inferences resolved in the Government's favor>" Valle, 807 F. 3d at 515, "specious inferences are not indulged, "id. (quoting Lorenzo, 534 F.3d at 159).

RULE 33 ANALYSIS

In deciding Rule 33 motion for a new trial, courts must determine "whether letting a guilty verdict stand would be a manifest injustice. "United States v. Aguiar, 737 F.3d 251, 264 (2d Cir. 2013) (quoting United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001)).

Under Rule 33, the Court need not view the evidence in the light most favorable to the government; rather, it may "weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. "United States v. Sanchez, 969 F. 2d 1409, 1413 (2d Cir. 1992) (Internal quotation marks omitted). The Court also may hold an evidentiary hearing to resolve factual disputes. See, e.g., United States v. Colon-Munoz, 318 F.3d 348, 358 (1st Cir. 2003). Here the false argument by government that Scott Stout worked at Morgan Stanley Private Bank as to Morgan Stanley Smith Barney which is not FDIC insured necessitates evidentiary hearing to determine the facts and truth. Additionally defendant submitted motion to compel for the ICBC London lending file and thus an evidentiary hearing is necessary to determine the factual basis for government's proffer and evidence at trial with respect to the ICBC London transaction.

TRULINCS 54001048 - BRENNERMAN, RAHEEM J - Unit: BRO-I-B

---

FROM: 54001048
TO:
SUBJECT: Re: RULE 29 & 33 MOTION REPLY - PART III
DATE: 05/22/2018 06:11:30 AM

The Defendant`s Conviction on Counts One Through Four is Not Supported by the Evidence

At Trial and In Government Opposition, government ostensibly argue and presented to the Court and Jury that "he sought private banking benefits to which he was not entitled, and which he would not have received had he been honest about himself and Blacksands. These benefits included preferential rates on credit lines and mortgage, as well as Morgan Stanley Platinum American Express card that carried certain rewards. (GX 1-72). Because "he lied about his citizenship, his annual salary and his liquid net worth. Assuming aguendo that government were correct - The Court of Appeals for the Second Circuit holds, that a defendant must intend to cause a bank a loss or potential liability, whether by way of "statutory law, common law or business practice." United States v. Laljie, 184 F.3d 180, 191 (2d Cir. 1999). We believe that this holding is effective shorthand for the legislative intent that the statute would proscribe conduct which undermines the integrity of federally insured institution. See Se. Rep. No. 98-225, at 377 (1984), reprinted in 1984 U.S.C.C.A.N 3182, 3517 (noting that the statute was intended to protect the "financial integrity" of banks).

To date, government has not highlighted or adduced any evidence how defendant interaction with Morgan Stanley Smith Barney was intended to cause a loss or potential liability to the institution because even though government argue that defendant became entitled to preferential rates on credit lines and mortgages - there is no evidence that defendant ever applied for or received any credit lines or mortgages. Moreover, the Platinum card was provided by American Express - another financial institution - not Morgan Stanley Smith Barney - which was opened in January 2013 and closed in May 2013 with zero balance. Defendant was introduced to Kevin Bonebrake at Morgan Stanley Investment Bank which is indisputably not FDIC insured an essential element for the bank fraud conviction.

Thus, government ostensibly proffers an argument that does not even satisfy the conduct necessary to indict much less prosecute for bank fraud. In United States v. Bass, 404 U.S 336, 349, 30 L. Ed 2d 488, 92 S.Ct 515 (1971), the Supreme Court held that "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance. Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by States. "We are disinclined to read a statute in a manner which permits it to trench on the domain of traditional state criminal law, circumscribed only by the exercise of prosecutorial discretion. The extension purpose here by the Government offends the balance of federal and state jurisdiction and our principle of comity by imposing federal law where the federal interest in remote and attenuated. We hold, therefore, that conduct, reprehensible as it may be, does not fall within the ambit of bank fraud statute when the intention of the wrongdoer is not to defraud or expose the bank to any loss but solely to defraud the bank`s customer. Our holding today is consonant, not only with Congressional intent but also with our federal criminal law jurisprudence."

But federal interest is attenuated or non-existent here, because Morgan Stanley Smith Barney where Scott Stout worked at is not FDIC insured and neither is Morgan Stanley Investment Bank where Kevin Bonebrake worked at. "alleged thieves are entitled to dismissal of indictment alleging conspiracy to commit bank fraud in violation of 18 USCS 1344, where thieves stole mailbox, set it up as "temporary depository" at bank, and thereby tricked bank customers into depositing money into box that they later retrieved, because bank fraud statute covers only crimes in which victims are federal financial institutions." United States v. Best (1990, MD Tenn) 731 F Supp 883; See also United States v. Cocilova (2008, WD Va) 584 F Supp 2d 855, where it was likely that defendant, as office manager and keeper of company`s book, merely fooled various corporate officers into signing checks that she had prepared, court set-aside verdicts of guilty as to bank fraud under 18 USCS 1344, since fraud was committed against company, and not federal insured bank; See also "United States v. Odiodio (2001, CA5 Tex) 244 F.3d 398"; See also "United States v. White (2009, MD Ala) 597 F Supp 2d 1269. In this case not only did government fail to present a federally insured financial institution. Government also failed to present conduct by defendant prosecutable under 18 USCS 1344, bank fraud or 18 USCS 1349, conspiracy to commit bank fraud. Moreover Exhibits (GX 1-57, GX 1-57A, GX529, 530, 531, 532) and (GX 1-73) all conclusively demonstrate that defendant interacted with Morgan Stanley Smith Barney which is not FDIC insured. Thus, evidence adduced by government taken in the light most favorable to government does not support a bank fraud conviction. Defendant motion for a judgment of acquittal should be granted in its entirety as to 18 USCS 1349, conspiracy to commit bank fraud and 18 USCS 1344, bank fraud.

The Indictment charged in relevant parts that, defendant misrepresented his "name", "national origin", "scale and scope of the company that sponsored the visa" and stated in relevant parts "which he knew to be falsely made, to have been procured by means of a false claim and statement"

Government argued at trial and in its opposition motion that the evidence adduced highlight, that on October 29, 2012,

TRULINCS 54001048 - BRENNERMAN, RAHEEM J - Unit: BRO-I-B

---

Aderinwale (demonstrating that he is an officer of the company) submitted to USCIS an I-129 petition for a Nonimmigrant Worker on behalf of Blacksands requesting that the defendant receive an L-1multinational executive visa (GX 51). the I-129 Petition falsely stated among other things, that Blacksands "engaged approximately 235 third party contractor for technical and administrative services, "had a gross annual income of $45.2 million, and a net annual income of $2.6 million (GX 51). Richard Collins, a USCIS explained at trial that "a company's scope and nature would definitely play into other eligibility grounds for an L-1" visa (Tr. 104). Government then argues that - The I-129 Petition also misrepresented the defendant's country of birth as "United Kingdom" and stated his address of residence as a virtual office space in Los Angeles, California (GX 51). On November 26, 2012, the defendant submitted an application for an L-1 visa based upon the I-129 Petition (GX 484). the defendant falsely stated, under penalty of perjury, that he had never before applied for or received a United States visa, despite the fact that he had done so under a different name and place of birth in 2000 (GX 481, 484, 485, 486). He also lied about whether he held or previously had ever held nationality other than with the United Kingdom; the State Department had a record of his Nigerian passport from his 2000 visa application, and he admitted in a telephone call with Aderinwale that he had a Nigerian passport and citizenship at least as recently as 2004 (GX 452-T, 484, 485). At trial, the government established that the defendant used the visa in at least two instances; to procure a social security card (GX 10D-T, 12, 45, 483; Tr. 975-80) and to obtain a New York State identification card (GX 12, 40, 44, 483, 607).

From all evidence proffered and adduced, government failed to establish the elements of the charged offense. First, government failed to prove that in 2012 when defendant applied for the visa, he misrepresented his name as Raheem Jefferson Brennerman, his birth name, because even though government adduced a one page document in the State Department record, government failed to provide any supporting information with the one page. Moreover within government's possession were defendant's other identification which conclusively confirmed his birth name, nationality and national identity which he submitted to USCIS in California for his adjustment of status application. Additionally government charged that defendant misrepresented his "national origin" - however government were in possession of defendant's United Kingdom national identification from 2012 and defendant properly stated his nationality as United Kingdom. Furthermore, although government argue about the gross income of $45.2 million and net annual income of $2.6 million, they (government) made no findings as to the evidence (in excess of nine hundred pages) which was submitted as part of the I-129 application as detailed above.

In 2012, Blacksands through its Nigerian sub-subsidiary - Blacksands Pacific Nigeria Exploration & Production Limited owned and maintained 60% interest in Oil Prospecting License ("OPL") Black 2012. Blacksands Pacific Nigeria Exploration & Production Limited was a fully-owned subsidiary of Blacksands Pacific International Limited which was a fully-owned subsidiary of The Blacksands Pacific Group, Inc as of 2012. OPL 2012 ("the asset") was entitled to production from Agbara field which straddled between OPL 2012 and OML 116 and Blacksands entitlement from that asst generated total revenue of $45.2 million and a net annual income of approx. $2.6 million around the time of making the application. In fact ICBC (London) PLC engaged Linklaters LLP, a white-shoe law firm in London, United Kingdom and Aluko & Oyebode LLP, a prominent law firm in Lagos, Nigeria to undertake extensive diligence on Blacksands and its interest in OPL 2012 in 2012. Both Linklaters LLP and Aluko & Oyebode LLP after undertaking extensive diligence including confirming with the Department of Petroleum Resources, both confirmed to ICBC (London) PLC that Blacksands did indeed maintain the interest in the asset resulting in ICBC (London) PLC approving $250 million comprising of $45 million tranche A and $205 million tranche B finance to Blacksands which was ultimately rejected by Blacksands for being untimely. As part of the operations on oil and gas assets, Blacksands engages the services of third party providers such as Schlumberger and others and as of the time of submitting the L-1A application in 2012, Blacksands engaged in-excess of 235 third party contractors for the OPL 2012 asset. To date, government adduced no evidence to rebut this argument only to state inaccurately that these were false even though enclosed within the application and exhibit submitted which comprised in excess of 900 pages, Blacksands included all the confirmations from the Nigerian Department of Petroleum Resources regarding the OPL 2012 asset, the $250 million finance confirmation from ICBC (London) PLC and other joint venture contracts which Blacksands had entered into in the United States. Government argued that Blacksands Pacific Group, Inc did not file tax returns, however government is not charging the company with failing to file tax returns but instead arguing although inaccurately or rather inappropriately that the income stated falsely without presenting any other evidence to support its erroneous argument.

Furthermore, government failed to adduce any evidence which demonstrated beyond all reasonable doubt that there were false statements which defendant "knew to be falsely made" or that defendant knew that his visa was "procured by means of a false claim and statement" because defendant was unaware of the online application which may have inappropriately advised of his previous visa application in 2000 or that he previously held a Nigerian passport or citizenship or briefly adopted his step-father's name between 1994 to 2002. Moreover because an agency processed the visa application on behalf of defendant, he was never personally, under penalty of perjury, and defendant was not provided a copy of the online application or placed under oath when he attended the U.S embassy in Dublin to obtain his visa.

"Rule of lenity applied and defendant was properly acquitted of violating 18 USCS 1546(a) as statute was grievously ambiguous as to whether "knowingly presents" clause required affirmation made under oath as canon of statutory construction that

TRULINCS 54001048 - BRENNERMAN, RAHEEM J - Unit: BRO-I-B

---

required Court to, if possible, give effect to every clause and word of statute pointed in opposite direction to last antecedent canon, and neither statute`s structure nor its legislative history convincingly resolved dichotomy. "United States v. Ashurov (2013, CA3 Pa) 726 F.3d 395.

Moreover, at trial, defendant trial counsel failed to adduce appropriate responses from government witnesses which would have informed the court and jury, because defendant trial counsel were conflicted and defendant was prejudiced. "A defendant`s right to counsel under the sixth amendment includes the right to be represented by an attorney who is free from such conflicts of interest." United States v. Kliti, 156 F.3d 150, 153 (2d. Cir. 1998).