*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 20, 2018

**BY ECF**

The Honorable Richard J. Sullivan
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Raheem J. Brennerman*, 17 Cr. 337 (RJS)

Dear Judge Sullivan:

    The defendant, Raheem J. Brennerman, is scheduled to be sentenced on July 27, 2018 at 4:00 p.m., following his conviction for wire fraud, bank fraud, conspiracy to commit wire and bank fraud, and visa fraud. The Government respectfully submits this letter in connection with the sentencing and in response to the defendant's sentencing submission ("Def. Sub.").

    A stiff punishment is necessary in this case. Brennerman committed an audacious fraud, one that involved layers of deception about his identity, his purported business, his use of his victims' funds, and his willingness and ability to repay his victims. At trial, the Government proved that Brennerman stole approximately $5 million from the Industrial and Commercial Bank of China ("ICBC"), and attempted to steal significantly larger sums from ICBC and other victims. This crime was not one of impulse. It required meticulous and extensive planning by Brennerman, including the creation of shell corporations, the fabrication of company financials and promotional materials riddled with lies, and the invention of fake employees. Brennerman also used the identities of victims, including a former girlfriend, without authorization, to dupe ICBC into believing that there was more to Brennerman's companies than just Brennerman. Once he stole ICBC's money, Brennerman told lie after lie to prevent ICBC from obtaining a return of its funds, all the while spending ICBC's money extravagantly on himself. As described below, this was not aberrant conduct for Brennerman: he successfully perpetrated permutations of this fraud on other occasions, stealing funds from another victim just months before his arrest. Brennerman's pattern of criminal conduct, and his failure to take responsibility for his conduct to this day, leads to one conclusion: he will reoffend if given the opportunity.

    For the reasons stated below, the Government respectfully submits that the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range is 135 to 168 months' imprisonment and that a sentence within the advisory Guidelines range would be sufficient, but not greater than necessary, in order to reflect the nature, circumstances, and seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence.

## I. Factual Background

### A. Personal Background

Brennerman was interviewed by Probation on October 18, 2017, and June 1, 2018, about his personal background. Despite his conviction for visa fraud, in those interviews Brennerman doubled down on certain lies, and contradicted his prior statements, about his personal background.

Brennerman continues to claim that he was born in the United Kingdom. (PSR ¶ 63.) The evidence at trial, however, proved that Brennerman was born "Ayodeji Soetan" in Nigeria on April 21, 1978. (GX 484, 485.) In his presentence interviews, Brennerman acknowledged that members of his family have the surname Soetan and reside in Nigeria (PSR ¶¶ 55-56), but was unwilling to be truthful about his own place of birth—a material fact in his conviction for visa fraud. Lies about his background are nothing new for Brennerman. The evidence at trial established that in promotional materials that Brennerman sent to his victims, he stated that he was a "native of New York," a United States citizen, and "United States and United Kingdom dual national." (GX 1-38, 1-57A, 1-67C.) Additionally, his profile on his company's website claims his "family energy business . . . was started by his paternal grandfather in Louisiana and was run by his father and brother." (*See* Ex. A.) That claim—the falsity of which is now apparent—is contrary to Brennerman's indication to Probation that he was estranged from his father and that his brothers are plainly not involved in the energy business. (PSR ¶¶ 55-56.)

Brennerman also told Probation that he has a bachelor degree in economics and a master degree in financial economics from the University of London. (PSR ¶ 69.) It appears that the defendant revised his resume during his interviews with Probation. As established at trial, Brennerman has previously claimed that he received a bachelor degree from the London School of Economics and a master degree from Columbia University. (GX 1-64, 1-67C.) But at trial, the Government proved that Brennerman never attended Columbia University. So now, for the first time that the Government is aware of, Brennerman claims that he also received a master degree from the University of London.

Brennerman (likely truthfully) told Probation that he has never been married. That statement, however, is contrary to what Brennerman stated in April 2017—shortly before his arrest—to a mortgage company that was foreclosing on Brennerman's apartment in London that he told Probation he owns. (PSR ¶ 60.) In an affidavit prepared in the name of "Mike Kelly"—one of Brennerman's made-up employees—Brennerman claimed that he had not paid his mortgage on the property because he had "undergone a prolonged and contentious divorce" and because he had a "kidney transplant." (GX 1-38.) Both of those explanations made on the eve of Brennerman's arrest were false—as the PSR indicates, Brennerman has never been married or had a kidney transplant. (PSR ¶¶ 55, 59, 65.)

Some of these lies were material parts of Brennerman's fraudulent schemes. Other lies are gratuitous, serving no apparent purpose other than to paint a picture of Brennerman as someone that he is not. The Government notes Brennerman's prior inconsistent statements and lies to Probation about his own background because they highlight the fact that deception lives loudly within him. Despite his criminal conviction, he is undeterred.

### B. Procedural Background

On May 31, 2017, a grand jury in this District returned a four-count indictment charging the defendant with conspiracy to commit bank and wire fraud, in violation of 18 U.S.C. § 1349; bank fraud, in violation of 18 U.S.C. § 1344; wire fraud, in violation of 18 U.S.C. § 1343; and visa fraud, in violation of 18 U.S.C. § 1546(a). The defendant was arrested the same day. On November 27, 2017, the defendant went to trial on the aforementioned indictment. At trial, the Government presented testimony from twenty-four witnesses, and introduced nearly three hundred exhibits. On December 6, 2017, after a few hours of deliberation, the jury returned a verdict of guilty on all counts.

### C. Offense Conduct

The evidence at trial established that Brennerman perpetrated an elaborate scheme to defraud banks in connection with the lending of money by those banks to Brennerman's fictitious company, Blacksands Pacific Group.

In March 2013, Brennerman approached ICBC (London), plc about lending his company, Blacksands, up to $600 million to purchase Cat Canyon, an oilfield in California, and ERG, the company that owned the oilfield. (Tr. 444-49.) On April 3, 2013, the defendant met with Julian Madgett, a banker at ICBC, to discuss his proposal. (GX 1-65; Tr. 446.) Throughout that meeting, subsequent meetings, and in numerous emails, the defendant falsely represented to Madgett that, among other things, the defendant was actively in negotiations to purchase Cat Canyon, that those negotiations were in an advanced stage, and that ERG wished to close the transaction with the defendant within a few weeks of the April 3 meeting. (GX 1-65, 1-66; Tr. 448-49, 454-456.) The defendant also falsely represented to ICBC that he operated Blacksands, a large oil and gas company, with substantial oil reserves and sizeable daily production ("in excess of 600 million barrels of oil equivalent proved reserves") (GX 1-67C), over a billion dollars in assets, and net income revenues exceeding $80 million. (GX 1-2, 1-2A, 1-3, 1-4, 1-4A; Tr. 461-62.) The defendant produced fabricated financial statements in which he claimed Blacksands had experienced year-over-year growth of over 100 percent from 2011 to 2012, falsely describing the paper-only company as one which had developed proven oil reserves into production flows that generated a large profit. (GX 1-67C; Tr. 462.) He also lied to ICBC by claiming the Blacksands had over one hundred employees and physical offices throughout the United States, including in New York. (GX 1-67, 1-67A, 1-67C, 1-68; Tr. 461.)

To secure a $20 million bridge loan from ICBC, the defendant lied yet again, this time claiming that Blacksands had an agreement to acquire Cat Canyon, and signed a loan agreement requiring that the proceeds of the loan be used for the oilfield acquisition. (GX 1-5, 1-12; Tr. 448-77.) Madgett testified at trial that the representations by the defendant about his experience and Blacksands' size and operations were important to ICBC in deciding whether to make a loan to the defendant and Blacksands. (Tr. 462-63, 472-74, 477, 483, 486.) But the information the defendant provided about Blacksands was either fabricated entirely or stolen from a former executive at oil and gas company, who had provided information to the defendant about him and his colleagues pursuant to a confidentiality agreement that the defendant shamelessly violated. (GX 1-19, 1-21, 1-52C; Tr. 269-311.)

The defendant made similar representations to Morgan Stanley in an attempt to induce its employees to provide him with private banking services and make loans to the defendant's company for the purported acquisition of the California oilfield. (GX 1-57, 1-58, 1-58A, 1-60, 1-63, 1-64. 1-67A, 1-72.) In opening an account with Morgan Stanley, which Brennerman plotted to use as an entry point for obtaining financing from the bank, he lied about several topics, including that he was an American citizen, earned "$720,000 (Base Salary)," and had an "Est. Liquid Net Worth" of $45 million. (GX 1-57A.) Within days of getting his account opened, Brennerman set his sights on getting access to Morgan Stanley's investment bank by lying about the size and profitability of his purported company. For instance, Brennerman told Morgan Stanley that Blacksands had earned "approx. 643m" in revenue and "approx. $189m" in earnings in 2012. Once Brennerman was connected to the investment bankers at Morgan Stanley, he promptly requested $219 million in financing in order to develop Blacksands' (non-existent) "beneficial 'Working Interest' in the lease and mineral rights in the CAT CANYON Asset." (GX 1-61.)

The Government established at trial that the defendant's representations to, among others, ICBC and Morgan Stanley were false. Indeed, Blacksands had, at most, minimal involvement in the oil and gas industry, and lacked oil assets and revenue (besides the proceeds that the defendant stole from banks and investors). (Tr. 1071-72, 1077-81.) Blacksands did not have any real offices; instead, the defendant paid for virtual office spaces around the United States to create the appearance that Blacksands was a real company. (GX 400, 401, 402, 403, 404; Tr. 1148-63) In reality, the defendant signed agreements and sent emails containing the aforementioned fraudulent representations—sometimes on behalf of fictitious Blacksands executives—from his apartment in Las Vegas, Nevada. (GX 1-1, 1-2, 1-4, 1-4, 1-6, 1-11, 1-13, 1-16, 1-52, 1-61, 1-65, 1-66, 1-67, 600; Tr. 240-58). The employees that the defendant claimed to have all fell into one of two categories—either they were actually employees of another company (Black Elk), whose names and biographies were stolen and were being used without their knowledge (GX 1-52C, 1-67B, Tr. 300-03), or they were entirely fictitious (Michael Sloane, Mike Kelly, Annisa Rodriguez) (Tr. 1023-24, 1027). The purported deals Blacksands had made to purchase assets or property—such as the California oilfield—were never imminent or completed. (Tr. 802-23.) The defendant never had an agreement, whether imminent or realized, to purchase the California oilfield. (Tr. 858-77.) In fact, the owner of the oilfield was in discussions to sell the property to an unrelated third party. (Tr. 885-86.)

On December 3, 2013, the defendant received approximately $4.4 million from ICBC in a bank account in the name of Blacksands. (GX 1-16, 523; Tr. 1285, 1288-89, 1291-92, 1314.) To evidence that the funds were being used for legitimate purposes, Brennerman forged a check and fabricated what purported to be internal company documents. (GX 1-5, 495.) Contrary to what these documents represented, Brennerman moved these funds through multiple bank accounts and then spent a majority of the fraudulent proceeds on personal expenses rather than the acquisition of Cat Canyon. (GX 515, 527, 528, 535; Tr. 996-97, 1299-1318.) For example, the defendant used the money from ICBC's loan to pay for the lease of his Las Vegas apartment, flights from the United States to Europe, private car services, room service, designer clothing, jewelry, and spa treatments. (GX 213, 310, 492, 528; Tr. 1303-16.)

At trial, the defendant was also convicted of visa fraud. The evidence showed that the defendant made many of the same false statements about his identity and business to USCIS and

the State Department in order to obtain an L-1A multinational executive visa. He falsely stated his place of birth and his address of residence. (GX 481, 484, 485, 486; Tr. 895-900.) He also lied by failing to inform USCIS that he had previously been issued a United States visa (in the name Ayodeji Soetan) and holding a nationality other than that of the United Kingdom. (GX 452-T, 481, 484, 485, 486.) After the defendant acquired the visa, he used it in New York to obtain a social security card (GX 10D-T, 11, 12, 45, 483; Tr. 975-80) and a New York State identification card (GX 12, 40, 44, 483, 607), both of which he later used in furtherance of the scheme to defraud banks and others in connection with Blacksands and his other purported businesses (GX 1-57A).

### D. Brennerman's Commission of Additional Fraud

Brennerman's fraud on ICBC and Morgan Stanley was not an isolated incident. Rather, in October 2016 and extending to the time of his arrest, Brennerman committed a nearly identical fraud against ███████, an oil production and distribution company based in Texas and Nigeria.

In October 2016, Brennerman contacted ███████, the CEO of ███████, about collaborating in a purported deal to procure certain oil assets in Nigeria. Brennerman told ███ that Blacksands Pacific was acquiring the production rights over certain Nigerian oil assets owned by the Nigerian government. Brennerman gave ███ promotional materials, which estimated the amount of oil in the Nigerian oil assets, provided a financial analysis of the returns from the assets, and offered information about Blacksands Pacific. Among other things, the materials stated that the subsidiary of Blacksands Pacific that would be acquiring the Nigerian oil assets is "[o]ne of the largest privately owned oil and gas corporations by reserves in Africa" with "8 oil mining licenses in the Niger Delta with reserves totaling 2 billion [barrel of oil equivalents]."

Brennerman stated that his company was looking for a partner in the Nigerian oil assets deal. Brennerman represented that Blacksands Pacific would develop the Nigerian oil assets and already had a buyer in place for the oil, who would pay in excess of $110,000,000 per month for the oil that would be produced from the Nigerian oil assets. Brennerman proposed to sell ███ a twenty percent interest in the Blacksands Pacific subsidiary that would acquire the Nigerian oil assets rights, in exchange for $100,000,000. Under the terms of Brennerman's proposal, ███████ would pay Blacksands Pacific $7,500,000 (including a $2,500,000 down payment), and the remaining $92,500,000 of the purchase price would be paid out over time from ███'s revenue from the Nigerian oil assets.

On April 18, 2017, ███████ entered into an agreement with Blacksands Pacific to acquire a twenty percent interest in the Blacksands Pacific subsidiary that would own the rights to the Nigerian oil assets. As part of the agreement, Brennerman represented that Blacksands Pacific was solvent and that the money from ███████ would be used toward the Nigerian oil assets transaction. Brennerman also provided ███████ with wiring instructions for a Wells Fargo bank account. Pursuant to ███████'s agreement with Brennerman, on April 21, 2017, ███████ wired $800,000.00 to the Wells Fargo account. Based on the evidence at trial, there is no evidence that Blacksands Pacific ever acquired the Nigerian Oil Assets. Quite the opposite, an analysis of the bank records for that account show that Brennerman used the funds provided by ███████, which were intended to go toward the Nigerian Oil Assets transaction, to instead pay his personal expenses.

On May 15, 2017, ▇▇▇ learned that Brennerman had been arrested and contacted him. ▇▇▇ subsequently requested that the agreement between ▇▇▇ and Blacksands Pacific be canceled and that ▇▇▇'s money be returned. Brennerman denied to ▇▇▇ that he had committed any crimes, and had his attorneys send a letter stating that they expected "Brennerman will ultimately not be found to have engaged in any criminal conduct." This was all a smokescreen. Brennerman never returned the money because he spent it. In June 2018, Brennerman or an attorney acting on his behalf contacted ▇▇▇ and stated that if ▇▇▇ sent a letter to the Court and Department of Justice stating that the oil asset acquisition did not fall through, and that ▇▇▇ was not a victim of fraud, then Brennerman would return some or all of ▇▇▇'s funds. ▇▇▇ intends to appear at the sentencing.

In addition to the fraud on ▇▇▇, there is evidence that Brennerman defrauded or attempted to defraud other victims. For instance, in 2016, Brennerman contacted potential investors about a development project he was doing in Brooklyn called "Project Shanghai." According to the two victims – ▇▇▇ and ▇▇▇ – they were each separately approached about investing in the real estate project that Brennerman claimed he partially owned. That was a lie: according to an investor in the property, Brennerman never had an ownership stake, and Brennerman has since stated in court that he has no property interests in the United States. ▇▇▇ declined to invest because he had suspicions about the deal and had previously lost money in a deal in the United Kingdom with Brennerman in the early 2000s, which he suspected might have been fraudulent.[1] ▇▇▇, however, was convinced by Brennerman to invest in the project. She and another investor pooled $700,000, which was wired to an account at Wells Fargo. After wiring the money, communications with Brennerman and his company became sparse. Eventually "Mike Kelly" started to correspond with ▇▇▇ and told her, in substance, to stop asking so many questions about the project. When ▇▇▇ learned about Brennerman's arrest, she sent him a text message to ask about her investment. Brennerman responded, "I have been in a medical situation for three weeks and nobody has reached me as my phone was off…" ▇▇▇ asked Brennerman if Kelly was also on medical leave because she was unable to reach him as well. Brennerman responded, "we had a car accident," which is false. ▇▇▇'s money was never returned to her and, instead, was spent by Brennerman on personal expenses.

Additionally, in April 2017, a mortgage company in the United Kingdom commenced proceedings to foreclose on an apartment owned by Brennerman. As described above, Brennerman submitted a filing under the name "Mike Kelly," stating that he was in the middle of a divorce proceeding, and had had a kidney transplant, and that was why he was late in making payments. Brennerman enlisted Philip Falese, an attorney in California, to write a letter (attached as Exhibit B) stating that Brennerman had $6,498,000 in escrow "as proceeds from the sale of a certain property in New York City, arising from the dissolution of his marriage and marital estate." Falese has informed the Government that Brennerman wrote the letter and asked Falese to put it

---

[1] The United Kingdom transaction is described in a November 26, 2012 article published in *The Guardian*. *See* The Guardian, "How Secret Offshore Firms Feed London's Property Boom," Nov. 26, 2012, https://www.theguardian.com/uk/2012/nov/26/secret-offshore-firms-fuel-london-property. The allegation in the article is that Brennerman convinced the Royal Bank of Scotland to finance the acquisition of a property, and that after receiving the funds, the project collapsed and Brennerman absconded with investors' funds. Brennerman subsequently sued *The Guardian* and other parties for defamation. That lawsuit was dismissed.

on law firm letterhead in exchange for a $3,000 payment (although Brennerman only paid him $500). Falese also confirmed that the statements in the letter were false, and that no funds were being held in escrow.

Besides each of these frauds, Brennerman has repeatedly tricked major law firms into representing him or his purported company on promises to pay, and then not paid them for the work performed. Those firms include Latham & Watkins LLP, Clarke Locke LLP, Baker Botts LLP, and Carter Ruck Solicitors, among others. The Government has also learned through interviews that at various times Brennerman has refused to pay (and in some instances has been sued) for missed lease payments, consultants to his business, web design services, and even a foreign college student's tuition that he claimed to be sponsoring at Syracuse University.[2] While a failure to pay one's bills alone is not a crime, Brennerman's pattern of conduct for over a decade evidences something more: through lies and deceit, and misrepresentations about who he is and what line of work he is in, Brennerman has stolen money, property, or things of value from people and entities in all walks of life. There is no fraud too big or too small for him.[3]

### E. Brennerman's Conviction for Criminal Contempt

In 2014, after Brennerman failed to repay the loan from ICBC, the bank sued his company. Brennerman counterclaimed and denied responsibility for repaying the loan. ICBC initiated post-judgment discovery in an effort to locate assets to satisfy the judgment, serving document requests and interrogatories in March 2016. Blacksands initially stonewalled the discovery requests, interposing frivolous objections. ICBC moved to compel responses, and on August 22, 2016, the Honorable Lewis A. Kaplan directed Blacksands to "comply fully with the outstanding discovery requests within fourteen days of the date of th[e] order." (Dkt. No. 87, No. 15 Civ. 70 (LAK).) Nonetheless, Blacksands did not provide responses to the outstanding discovery requests. On September 27, 2016, Judge Kaplan entered another order directing Blacksands to "comply fully" with the outstanding discovery requests by October 3, 2016. The order warned that "[a]ny failure to comply with this order may result in the imposition of sanctions." (Dkt. No. 92, No. 15 Civ. 70 (LAK).) Blacksands did not comply with the orders, and on October 20, 2016, Judge Kaplan orally held Blacksands in civil contempt and imposed coercive sanctions. Blacksands, however, at Brennerman's direction, continued its defiance, so December 13, 2016, Judge Kaplan held Brennerman in civil contempt and imposed coercive sanctions on him.

The matter was subsequently referred to the United States Attorney's Office, and Brennerman was prosecuted and convicted of committing criminal contempt. At the trial, the Government proved that one of the defendant's motives in refusing to comply with Judge Kaplan's orders was to conceal from ICBC documents that would have revealed that Brennerman used the loan proceeds for personal expenses. (The documents would also have likely revealed that

---

[2] Brennerman cites his purported philanthropic efforts, including "sponsoring Eastern European students to study in the United States," in his sentencing submission. (Def. Sub. at 6.) However, the Government has learned from an interview with a student who traveled to the United States that Brennerman failed to pay her tuition once she arrived here, and that she was forced to drop out of college as a result.

[3] In October 2017, the Government learned that the defendant repeatedly used another inmate's PAC number to place telephone calls, which is at a minimum a violation of Bureau of Prisons policy.

Brennerman's company, Blacksands, was a fiction.) On May 21, 2018, Judge Kaplan imposed a sentence of 24 months' imprisonment and a $10,000 fine, and formally recommended that this Court impose the sentence in this case to run consecutively to the sentence imposed by Judge Kaplan.

## II.     Sentencing Guidelines Range

The Probation Office concluded, correctly in the Government's view, that the applicable Guidelines range is 135 to 168 months' imprisonment. In accordance with the 2016 Guidelines Manual, the Guidelines range should be calculated as follows:

1. Counts 1, 2 and 3 of conviction are grouped together, pursuant to U.S.S.G. § 3D1.2(b). The Guideline for violations of violations of 18 U.S.C. § 1344, 1343, and 1349 is U.S.S.G. § 2B1.1.  (PSR ¶¶ 25, 27.)

2. Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is seven because the offenses have a statutory maximum of at least 20 years' imprisonment.  (PSR ¶ 27.)

3. Pursuant to U.S.S.G. § 2B1.1(b)(1)(K), the offense level is increased by twenty because the value of the loan secured by Brennerman was in the amount of $20 million.  (PSR ¶ 28.)

4. Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), the offense level is increased by two because Brennerman manufactured fraudulent documents, made up fake employees, and used other sophisticated means during the commission of the offenses.  (PSR ¶ 28.)

5. Pursuant to U.S.S.G. § 2B1.1(b)(16)(A), the offense level is increased by two because Brennerman derived more than $1 million from ICBC, a financial institution.  (PSR ¶ 28.)

6. Pursuant to U.S.S.G § 3C1.1, a two-level increase to the offense level is appropriate because the defendant undertook obstructive acts to conceal his fraud, including disobeying court orders, contacting potential witnesses against him, and fabricating documents.  (PSR ¶ 33.)

7. Based upon the foregoing, the applicable Guidelines offense level is 33.[4]

8. Because Brennerman, as discussed below, has not accepted responsibility, no downward adjustment is appropriate.  (PSR ¶ 46.)  Accordingly, the total offense level is 33.  (PSR ¶ 47.)

---

[4] The Guideline for 18 U.S.C. § 1546(a) is U.S.S.G. § 2L2.2 and the total offense level is eight.  (PSR ¶¶ 35-40.)  As described in the PSR, Count 4 does not group with Counts 1 through 3, and based on the offense level for Count 4, no multiple count adjustment is appropriate.  (PSR ¶ 41.)

Based upon the information now available to the Government, the defendant has zero criminal history points.[5] Therefore, Brennerman's Criminal History Category is I. (PSR ¶ 50.) In accordance with the foregoing, the applicable Guidelines range is 135 to 168 months' imprisonment. In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. Pursuant to U.S.S.G. § 5E1.2(c)(3), at Guidelines level 33, the applicable fine range is $35,000 to $10,000,000. Based upon the information now available to the Government (including representations by the defendant), Brennerman appears to be able to pay a fine. In fact, in a letter dated March 1, 2018, Brennerman stated that he "is not claiming to be indigent or impecunious, as he has assets outside of the United States."

## III. Discussion

A sentence within the applicable Guidelines range of 135 to 168 months' imprisonment for Brennerman is appropriate, but not greater than necessary, to reflect the nature and circumstances of the offense, the history and characteristics of the defendant, and the seriousness of the offense, and to promote respect for the law, afford adequate deterrence to disobedience of court orders, and to protect the public from further crimes of the defendant. *See* 18 U.S.C. § 3553(a).

*First*, the defendant's brazen scheme to con investors, such as ICBC and Morgan Stanley, out of millions of dollars is an extremely serious crime that requires significant punishment. These crimes did not involve merely a single false representation, or one act of fraud. Rather, they involved a concerted and sustained effort by Brennerman to tell lie upon lie to ICBC over a period of many months, all in an effort to steal millions of dollars from ICBC. As the evidence at trial showed, Brennerman made an array of false representations about himself, his company, the Cat Canyon project, and his planned use of the funds in order to convince ICBC to initially part with $20 million (approximately $5 million of which were immediately advanced). Neither Brennerman nor his fake company ever had the ability to finance the acquisition of Cat Canyon. After Brennerman tricked ICBC into giving him its money, he spent that money on himself. When ICBC asked for repayment of the loan, Brennerman did not have the funds – indeed, he had already started spending large quantities of ICBC's funds. Instead of admitting he did not have the money, he made up bogus excuses to put off ICBC, including his claim that there were problems with the Cat Canyon deal or ICBC that caused the delays. All the while, he kept lavishly spending ICBC's money on himself in Las Vegas and elsewhere. When ICBC sued Blacksands, Brennerman continued his lies, counterclaimed ICBC, transferred funds to other bank accounts, and refused to produce documents despite court orders.

This was not an isolated fraud by Brennerman. Rather, as described above, Brennerman has attempted similar "advance fee" schemes against other victims. He obtained $700,000 from a victim by tricking her into believing he owned a real estate investment in Brooklyn. He duped ███████ into giving him $850,000 for the acquisition and development of oil assets in Nigeria—again, assets that he never owned. Each time he stole money, Brennerman spent it on himself. And there are numerous other instances in which Brennerman lied and evaded: he has consistently bilked his debtors and employed a number of schemes to avoid repayment. Indeed, Brennerman's frauds are particularly serious because of the methods he has used to perpetrate them. He has

---

[5] Because Brennerman's conviction for criminal contempt has been deemed relevant conduct by Probation, no criminal history points are added pursuant to U.S.S.G. § 1B1.3.

stolen individuals' identities, invented fake employees, fabricated documents, paid for falsified records, submitted false statements to courts, and invented excuses like a kidney transplant, a divorce, and a car accident. In fact, from a review of Brennerman's emails and documents, it appears that he has claimed to have had more kidney transplants than he has kidneys. Some of Brennerman's lies have resulted in greater harm than others, but together they display a pattern of willfulness, complete disregard for the law and his victims, and a willingness to engage in frauds no matter the magnitude.

The defendant's motive is also relevant in assessing the seriousness of the offense. He was not destitute or in need of funds for subsistence. Among receiving money from his victims, the defendant immediately spent it on unnecessary luxury and indulgence. As the evidence at trial showed, the defendant spent victims' money on expensive clothes and watches, vintage wines, a luxury apartment, taxi and limo service, first-class airfare, extravagant meals, and his legal bills. This was pure, unmitigated greed. Brennerman's willingness to harm victims, including small investors and personal acquaintances, to fund such a lifestyle makes this a particularly serious crime warranting a lengthy sentence.

*Second*, a Guidelines sentence is appropriate because the defendant has displayed no regard or remorse for his crime or the harm that he caused to ICBC and others as a result of his repeated and flagrant lies. On recorded calls with his co-conspirator, Peter Aderinwale, the defendant has made clear that he does not care about his prior fraudulent acts: "I said I was American . . . who gives a fuck about that," and "you know fuck Mike Kelly or Mike Sloane [Brennerman's fake employees], it makes no difference . . ." (GX 450, 451.) To this day the defendant is entirely unrepentant for his actions. In his interview with Probation, he stated that "he has difficulty understanding his present situation . . . as he feels that he has been 'persecuted, not prosecuted." (PSR ¶ 67.) The defendant's conviction following the trial before Judge Kaplan, and the imposition of a sentence of two years, has not elicited a change in Brennerman's conduct or prompted a showing of remorse. Indeed, in his recent *pro se* court filings, the defendant has accused his victims of lying and withholding evidence, he has asserted that the trials were unfair, and he has claimed that his confinement in the MDC have been "harsh" and justify his release. In his sentencing submission, the defendant denies that he defrauded ICBC or Morgan Stanley, and claims that his visa fraud conviction is the result of the fact that "the agency engaged to complete an online application on his behalf incorrectly checked the wrong box on the form." (Def. Sub. at 6.) That the defendant shows no remorse for his crimes and, indeed, views himself as a victim is telling of the likelihood that he will re-offend. Accordingly, a substantial sentence of incarceration is also necessary to "protect the public from further crimes of the defendant" and afford adequate specific deterrence.

*Third,* a substantial sentence of incarceration is also sufficient but not greater than necessary to provide general deterrence to those engaged in advance fee schemes similar to the offense in this case, as well as to deter those who seek to defraud victims, as the defendant did here. Given the difficulties of detection and prosecution, and the substantial potential rewards from the criminal conduct, the imposition of a lengthy sentence is necessary to deter others from following in the defendant's footsteps.

The Government requests that the Court impose sentence in this case to run consecutively to the sentence imposed by Judge Kaplan. While the defendant's violations of court orders was

part of the defendant's broader fraudulent scheme, he has been convicted after two trials of separate crimes with different harms. In this case, as described above, the defendant's frauds caused the victimization of banks and individuals, and in most cases deprived them of money or property. In the case before Judge Kaplan, the defendant's disobedience caused a harm to the judicial system and rule of law. Evidence of Brennerman's criminal contempt was not offered at trial in this case. Because the harms are separate, the sentences should run consecutively.

Lastly, the Government requests that the Court order restitution in this case within 90 days of the sentencing for all victims that seek restitution for frauds committed by Brennerman. Additionally, the Government requests that the Court order the forfeiture of proceeds traceable to the defendants' commission of crimes, including the $100,000 that the defendant previously posted as a bond, which is directly traceable to the funds paid to the defendant by ███████. The defendant has indicated that he has property overseas. If the defendant is unable to pay a fine, an order of restitution, or forfeiture with funds held domestically, the Government respectfully requests that the Court order the repatriation of funds to the United States to satisfy the judgment.

## IV.   Conclusion

Accordingly, the Government respectfully submits that a sentence for Brennerman within the applicable Guidelines range of 135 to 168 months' imprisonment is appropriate in this case.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by: /s/ Nicolas Roos
Nicolas Roos
Danielle R. Sassoon
Robert B. Sobelman
Emil J. Bove III
Assistant United States Attorneys
(212) 637-2421

Cc: Raheem J. Brennerman (by mail)
   U.S. Probation Officer Specialist Katrina Minus-Shepard (by email)

**Exhibit A**

Blacksands

International Energy Group

- home
- about us
  - corporate profile
  - what we do
  - corporate governance
  - core corporate structure
  - group structure
  - Founder's Profile
  - Message From Executive Management
- our businesses
  - Oil & Gas
  - Mining, Infrastructure & Industry
  - Real Estate
- investor relations
  - committees
  - Stockholder Information
- media & reports
  - News Releases
  - Reports & Publication
  - Request Information
- responsibility
  - Overview
  - Corporate Governance Guidelines
  - Code of Business Conduct Ethics
  - Health Safety & Environment (HSE)
  - communities
- careers
  - Our Culture
  - Diversity
  - Compensation & Benefits
  - Job Openings
- contact us
  - Contact Information
  - Request Information

# about us

- corporate profile
- what we do
- corporate governance
- core corporate structure
- group structure
- Founder's Profile
- Message From Executive Management

# Raheem Jefferson BRENNERMAN

**Chairman and CEO, The Blacksands Pacific Group, Inc**
**Chairman of the Board, BLV Group Corporation, LLC**

Over a decade of International business in the areas of Finance, Real Estate (Investment and Development) and Oil & Gas (Upstream and Crude Oil & Petroleum Products trading).



Mr. Brennerman is an entrepreneur and Current Chairman and CEO of The Blacksands Pacific Group, Inc. In 2004, he founded BLV Group Corporation, LLC, where he now serves as Chairman of the Board. This New York-based firm is a leading multi-disciplined organization with focus in real estate investing, management and development, advisory, hospitality, lifestyle development, and philanthropy. The firm operates through various subsidiaries and provides a wide range of services worldwide to a substantial and diversified client base that includes corporations, sovereign organizations, and high-net-worth individuals. The firm is also an owner, developer, and manager of substantial real estate assets. Since its inception, the company has invested into or developed many residential and commercial properties around the globe, such as condo hotels, luxury condominiums, retreats, boutique hotels, and spas.

Mr. Brennerman co-founded The Blacksands Pacific Group, where he serves as the Chairman of the Board, President, and Chief Executive Officer. The Blacksands Pacific Group, is a Delaware, United States Corporation with core corporate offices in Los Angeles and Houston. The company operates in the United States, Canada, Asia Pacific, and the African region, where it explores, produces, and distributes natural gas and crude oil. The company also specializes in the marketing and trading of crude oil and various petroleum products.

Mr. Brennerman earned his Bachelor Honors degree in Economics with Business Administration, and worked as an Investment Banker with a focus in mergers and acquisitions in the U.S and European markets.

Prior to establishing Blacksands Pacific and BLV Group, Mr Brennerman previously worked for the family energy business which was started by his paternal grandfather in Louisiana and was ran by his father and brother. Mr. Brennerman also managed the family owned real estate businesses and investments both in the United States and Europe which was established by his maternal grandparents. Mr Brennerman's step-father introduced him to oil and gas trading business in the African region (especially West Africa) given the step-father's experience and heritage from the region.

Mr. Brennerman is an experienced investor and the principal of Jefferson III Holdings. A private Investment Corporation, with global presence and interest in industries including Oil & Gas, Alternative Energy, Real Estate (Investment & Development), Lifestyle, Hospitality and Finance.

Whether onshore or offshore, from the desert to rainforest. The Blacksands Pacific Group is committed to acting sustainably in the interests of our shareholders, our business, the natural environment and the communities where we operate worldwide.

We can and will do more to ensure our environmental performance is always improving, including the adoption of higher standards in our operation. We shall ensure that we remain a responsible and safe operator, a good partner to our host communities and the partner of choice to all.

Sincerely,
**Raheem Jefferson BRENNERMAN**
Chairman and CEO, The Blacksands Pacific Group, Inc
Chairman of the Board, BLV Group Corporation, LLC

- careers
- privacy policies
- terms of use
- alert
- Legal Notice





© 2015 THE BLACKSANDS PACIFIC GROUP, INC. All Rights Reserved. Website Design by PixFlex Media

**Exhibit B**

**From:** Philip Falese, Esq. <███████>
**To:** rahbnn01 <rahbnn01@gmail.com>
**Subject:** Re: Letter
**Date:** Fri, Apr 7, 2017 4:59 pm
**Attachments:** Brennerman R Certification 4.pdf (1086K)

Please find the attached...
Please remit the $500 now through Paypal ███████ or Philip Falese] and expect the balance of $2,500 shortly.

Thanks,

Philip


-----Original Message-----
From: J B <rahbnn01@gmail.com>
To: pfalese ███████
Cc: dixon <dixon@difalcapitals.com>; rbrennerman <rbrennerman@blacksandspacific.com>
Sent: Fri, Apr 7, 2017 1:33 pm
Subject: Re: Letter

Please find enclosed draft copy of the letter which I mentioned to you and which I require on your letterhead.

I look forwrad to receiving the letter from you

Thank you and Best regards

Raheem

Exh. 1-1

# LAW OFFICES OF PHILIP FALESE
WWW.PHILIPFALESELAW.COM

April 6, 2017

Re: Escrow Account: BRENN/NY/01.467

To Whom It May Concern:

I confirm that we hold six million four hundred ninety-eight thousand dollars (US $6,498,000) in escrow for the benefit of Mr. Raheem Brennerman, as proceeds from the sale of a certain property in New York City, arising from the dissolution of his marriage and marital estate.

To comply with the US tax rule, we require the beneficiary to complete and file his current-year tax returns to demonstrate that there are no pending tax liabilities to be deducted from the amounts held in escrow; upon receiving such evidence, we shall release and wire the funds in escrow in accordance with instructions received from Mr. Brennerman.

Although we have received instructions to wire funds from Ms. Rodriguez, we are not able to act on said instructions at this time.

Sincerely yours,

Philip Falese, Esq.

110 SO. LA BREA AVE., STE 215A, INGLEWOOD, CA 90301
TELS.

IN THE COUNTY COURT AT CENTRAL LONDON  
Thomas More Building  
Royal Court of Justice  
Strand, LONDON WC2A 2LL

Claim No. C00CL383  
Warrant Number: 1A181222

BETWEEN:

MORTGAGE TRUST LIMITED

Claimant / Petitioner

- and -

MR. RAHEEM JEFFERSON SOE-TAN BRENNERMAN

Defendant

## WITNESS STATEMENT

I, Mr. Mike KELLY, an executive vice president at BLV Realty Group, Inc., on behalf of BLV Realty Organization, Inc., at 245 Park Avenue, 39th Floor, New York, NY 10167, United States, make the following statement in support of the application submitted on behalf of the defendant for an order to cancel the eviction scheduled for April 28, 2017, and allow the defendant the time and opportunity to redeem the outstanding mortgage due to the claimant in full;

BLV Realty Organization, Inc., is engaged by the defendant as representative, agent, and broker for the management of the apartment at Flat K, 54-56 Cadogan Square, London SW1X 0JW, United Kingdom. We have managed the apartment since August 2012.

We submit the following in consideration of our application:

The defendant has made all necessary arrangements to settle, in full, the outstanding amounts owed to the claimant. The funds from the sale of his marital home in New York are held in escrow with the escrow attorney because all assets disposed of during the marriage dissolution had to be held with an escrow attorney until the divorce was final. (See enclosed *exhibit 1*, correspondence from the escrow attorney.) The escrow attorney requires compliance with the US tax regulation for US persons prior to the release of funds held in escrow. Although this practice is merely a formality, it is one that must be followed to ensure compliance. There will be no tax liability because the defendant did not received dividends while the divorce was ongoing, notwithstanding all the various schedules must be included in the tax filing.

At the end of February 2017 the defendant finalized his divorce and dissolution of marital estate, a highly contentious process that was prolonged approximately twenty months. During that time the defendant's assets, businesses, and accounts were subject to the Court's freeze order as requested by his now ex-wife. During that period the defendant was unable to satisfy all of his obligations, including obligations to the claimant, and that fact has led to the current situation, one that has been exacerbated by the building's Freeholders' interference in the relationship between the defendant and the claimant.

There was a service charges dispute between the Freeholders for the building and the defendant. However, while the defendant's divorce was ongoing, he was unable to conduct a meaningful dispute resolution because he was not represented by an English law attorney due to his financial situation arising from the Court's freeze order. The defendant initially decided to sell the apartment, but the buyer required the defendant to settle the dispute with the Freeholders, which he agreed to do. During the sale process, the freeholder became interested in the apartment, submitting an offer to the defendant. (See enclosed *exhibit 2*.) However, the defendant was unable to accept the offer because he had exchanged contracts with the purchaser. Deposits from the exchange of contract were paid to the claimant to reduce arrears on the mortgage account. Although the sale was initially scheduled to be finalized at the end of November 2016, issues relating to the Freeholders and the purchaser's ability to serve notice to extend the current lease caused the purchaser to extend the completion of the purchase to the end of January 2017. Immediately following the extension, an application was submitted to the Court on behalf of the defendant to extend the payment date on the order for relief from forfeiture due to the Freeholders. As a result, the Court recently scheduled a hearing for May 16, 2017 (enclosed as *exhibit 3*). While the Court application was pending, the Freeholders' solicitors notified the purchaser that the lease had been forfeited, prompting the purchaser to withdraw from the purchase and the defendant to reimburse him his purchase deposits and costs in full. At the same time, the Freeholders contacted the claimant to threaten forfeiture of their security (the apartment lease) unless the claimant enforced their security and took possession of the apartment. The Freeholders and the claimant agreed that, should the claimant take possession of the apartment, the Freeholders would grant them relief and not forfeit the lease. Presumably, such an arrangement provides the opportunity for the Freeholders to acquire the apartment from the claimant.

At the end of January, following the purchaser's withdrawal from the purchase, the defendant contacted the Freeholders' attorney to seek an explanation of the situation. Because I had been dealing with the matter prior to that, the attorney for the Freeholders advised the defendant that, upon making the payment to them, the matter would be deemed settled and there would be no further action required on his part. The defendant then sought clarification concerning whether any Court application would be required, and the Freeholders' attorney advised that no application or further action would be required once payment was made. (See enclosed *exhibit 4*.) At the same time, the defendant traveled from the United States to meet with the claimant at its office in Solihull, United Kingdom, to discuss and notify it that, upon concluding his divorce at the end of February, he would be in a position to redeem their account in full.

Following the meeting on February 2, 2017, the defendant received correspondence from the claimant's solicitor (enclosed as *exhibit 5*), requesting that he not send the funds to the Freeholders as previously agreed with the Freeholders but, instead, to the claimant because the funds must be sent from a UK solicitor. That change left the defendant confused because he was not sure which of the two directions to comply with—the Freeholders' or the claimant's. Furthermore, the request by the claimant placed a further burden on the defendant because he then had to appoint a UK solicitor, and to do so, he had to undergo the solicitor's client onboarding procedure and comply with their know your client (KYC)/anti money laundering procedure that, in itself, is cumbersome for a US person; the process itself could last from a few weeks to over three months. As a result, I advised the defendant to wait until his divorce was concluded at the end of February so he could use funds held in escrow on his behalf to pay both the Freeholders and the claimant simultaneously.

The defendant's divorce was settled at the end of February 2017, and in early March the defendant commenced his long overdue medical treatments, including a kidney transplant that had been delayed because he had been unable to afford the medical treatment due to the Court's freeze order, assuming that the arrangement had been made to use funds held in escrow to settle in full with the claimant and

2 | Page

the Freeholders. However, when his executive assistant, Ms. Rodriguez, submitted the request to the escrow attorney to transfer funds to settle the claimant and the Freeholders, she learned of their request for tax compliance. Neither the defendant nor I had prior knowledge of such a requirement because that was the first time we had been involved in a divorce process and dissolution of a marital estate. I have since taken over the matter in the defendant's absence to ensure that all tax filing requirements are met and so that funds held for his benefit are released to settle the claimant as aforementioned. We expect this to be concluded within the next thirty days.

In summation, we plead for the Court's mercy and for the claimant's forbearance to allow the defendant the opportunity to conclude the necessary process to comply with US tax regulations so funds held in escrow can be released and the outstanding mortgage owed to the claimant settled in full. The defendant has already undergone significant hardship through the divorce process and incurred health issues arising from the stress of undergoing a prolonged and highly contentious divorce. He plans to relocate to London, United Kingdom, to commence a new life, and this property is his main residence in London. He has taken every necessary step within his capacity, including disposing of assets, to settle the claimant in full. For the past thirteen years, the defendant has been a client of the claimant and maintained cordial relationships with the claimant; however, the situation became depressing due to the contentious divorce and the Court freeze order. Notwithstanding all those challenges, the defendant has ensured that adequate arrangements have been made to settle with the claimant in full.

Furthermore, there is negligible risk to the claimant because the Freeholder and the claimant had already entered into an arrangement. In addition, the claimant has made an application for relief from forfeiture. An eviction would cause irreparable damages to the defendant, and the claimant would immediately sell the apartment to the Freeholders. Hence, the option of being able to settle the outstanding mortgage once eviction has taken place is a significant risk to the defendant at this time.

We respectfully submit the above to the Court and request the Court cancel the eviction scheduled for April 28, 2017, to allow the defendant the time and opportunity to redeem the outstanding mortgage due to the claimant in full. This is a case where it would be appropriate to exercise the discretion conferred by s.36 Administration of Justice Act 1970.

In submitting the above to the Court, we respectfully request that all correspondence regarding this application be forwarded to my e-mail address at mkelly@blvrealtyorg.com. Doing so would avoid any delay in our response to comply with any court order.

Dated: 7 April 2017
New York, USA

Submitted,

Mr. M KELLY
On Behalf of the Defendant
By: Defendant